In the Matter of LOUIS FEUERMAN, an Attorney, Respondent.

First Department, January 10, 1930.

*Isidor J. Kresel* of counsel [*F. Sims McGrath* with him on the brief], for the petitioners.

*John P. Cohalan,* for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York in November, 1921, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department.

The petition charged the respondent with misconduct as an attorney at law under five specifications. The respondent duly appeared and answered, and by order of this court made and entered February 21, 1929, the matter was referred to a referee to take testimony in regard to said charges and to report the same with his opinion thereon to this court. The report of the referee finds that the charges under specifications lettered b, c, d and e of paragraph V of the petition were not sustained but that the charge under letter " a " was proven. The petitioners have moved for an order confirming the report of the referee. On this motion the respondent contends that the referee erred, both in fact and in law, in finding that the charge marked " a " was sustained by the evidence.

The charge, specified " a," in the petition, is as follows:

(a) For many years prior to February 1, 1928, the respondent herein was engaged in the solicitation of contracts and retainers from persons injured in accidents, retaining and authorizing him to act as their attorney to collect damages sustained by them as a result of such accidents and to bring suits at law in their behalf to recover such damages.

The referee's finding that respondent was guilty as charged is based on the testimony relating to four cases, *i. e.,* those of Bastardi, Duffy, Jones and Wachter.

The record discloses as to the Bastardi case that Bastardi was a barber. His boy of six broke his arm in 1924 in falling on a step in a hallway. Nothing was done about retaining a lawyer until about six or eight weeks after the accident, when Bastardi received a letter from one Rubin, whom he did not know. He called to see Rubin at his office in Park Row, and was introduced by him to respondent. Asked what talk he had with respondent, Bastardi

testified: " We had a talk, he asked me if I wanted to give him my boy's case, and then we will divide fifty-fifty." His testimony indicates that he signed a retainer although he could not read English and did not know what he was signing. Later he was told the suit was settled.

Respondent testified, as to the Bastardi case: " To the best of my recollection, the case was recommended to me and was brought in by a man by the name of Antonio Patti, who was a barber, for whom I closed a title on Grand Street, and he came in once with Mr. Bastardi. * * * Rubin was there at the time. Bastardi came in, and Mr. Bastardi was introduced to me by Mr. Patti and Mr. Rubin, and they explained to me that the boy lived on 38th Street, I believe, on the west side, he fell down a flight of stairs about six months ago, and I examined the father very thoroughly on the case, and went up to the house to make an investigation, to ascertain whether any of the people there knew what had occurred and I was satisfied that this man had a cause of action against the landlord."

On cross-examination Bastardi was asked: " Q. Do you know Paddy or Patty? " And his answer was: " A. I don't know about the second name. I know a fellow by the name of Tony."

In the Duffy case, James Duffy testified that his son Martin was injured in an automobile accident in November, 1924. About two days after the accident an insurance man who collected premiums from him told him to go down and see Mr. Rubin, that he was a lawyer and that he was all right in his estimation, and that he would take the case on a fifty-fifty basis. He went to Rubin's office, saw Rubin and Rubin said he would take the case on a fifty-fifty basis. About the second visit to the office he met respondent, and respondent said he would take charge of the case afterwards. On direct examination Duffy testified that he signed some papers giving the case to Rubin; that Rubin was the only man he had any dealings with. On cross-examination he testified that he did not arrange to have respondent act as his attorney, that Rubin introduced respondent to him.

Respondent freely admits that Duffy was introduced to him by Rubin. It is his contention that Duffy saw Rubin of his own volition, and not at the instigation of Rubin or any person acting on his behalf; that the record discloses no one solicited Duffy.

In the Jones case, Adele Jones testified that in 1926 she fell down the stairs in the court yard of the apartment house where she then resided. She did not have in mind the possibility of suing her landlord, and took no steps and made no effort to get anybody to represent her. About two or three months after the

accident a stranger came to see her; he had all about the accident written down in a paper and he told her all about it. She testified: "I just didn't want to bother with it. He said I was foolish, that there was money there for me, and I had the accident, and I didn't have to tell him anything, that he knew all about it, and that all I had to do was to sign the paper, and that was all there was to it." She then signed a paper about the facts of the accident, and the next thing she received a letter from Rubin asking her to go to his office in Park Row, which she did, and had an interview with Rubin. Mrs. Jones testified that she never saw or heard of respondent in the case; that she went to the office several times and saw Rubin and a young man and was examined by a doctor. The case was subsequently settled.

Respondent testified that Mrs. Jones was recommended to him by one Moe Kashkawall, a carpet cleaning salesman who worked with respondent at Morimura Bros. prior to respondent's admission to the bar. Julius Wolfson, respondent's clerk, testified that he filled out the retainer signed by Mrs. Jones, that she signed it in respondent's office, in Wolfson's presence. He further testified: "After she signed it, she gave it back to me, and as she was just going to leave, she said, ' Will you give me one of Mr. Feuerman's cards?' I said, ' Yes, sure.' She said ' Who shall I ask for when I call up on the telephone?' and I told her, ' Just ask for Mr. Feuerman, and he will handle your case.' " This witness also described what transpired at the time of the signing of the retainer, as follows: "I was not there when she first came in. All I know about this retainer, is this, as I just explained, that it was about eleven o'clock in the morning and I saw one of the young clerks in the office and he said, ' Say, Julius, come over here. This is Mr. Feuerman's matter, you finish it up, because I am in a hurry.' " That she was not talking to Rubin, but to a fellow by the name of Barney, a clerk in the office, and that he, Wolfson, got the retainer from Barney. Wolfson testified to letters sent to Mrs. Jones on respondent's letterhead, signed with respondent's name, and in this he is corroborated by Mary Aronoff, a stenographer in the suite where respondent had his office, who identified letters dictated to her by Wolfson and addressed to Mrs. Jones.

In the Wachter case, Miss Rose Wachter testified that in 1926 she was injured by the falling of the ceiling in the dining room of the place where she was then residing. Right after the accident she spoke to friends asking if they could recommend any one as an attorney. They did not and the matter rested for a number of months. Then a stranger came to her home, and, as she testified: "He told me that he had heard that I had been hurt in an accident

and he asked me if I would give him the case; so I asked him how he found out about me and he said that it was a private matter, that I should not worry about that, if I would give him 50 per cent of whatever he collected he would take the case and promise to get me a good amount of money for it." He gave her a card with the name of Rubin on it. After a few days she went to see Rubin at his office, 38 Park Row, and signed a paper agreeing to give fifty per cent of whatever was collected. Her recollection was that under this contract she was to give this to Mr. Rubin. She went to the office a couple of times; almost every time she saw Mr. Rubin, and just once spoke to Mr. Feuerman, when she was examined by a physician at the office; on this occasion Rubin introduced her to Mr. Feuerman, saying Mr. Feuerman would take care of her. She testified she thought Mr. Rubin was taking care of the matter for her. Thereafter she called Rubin on the telephone and asked him what he was doing about the case, and he said he expected it would be settled in a short time, he was trying to hold out for more money. Later she was informed by Rubin that he had collected some money and she should come down for it. On direct examination she testified she received cash from Mr. Rubin, but on cross-examination it was developed that she received a check of Louis Feuerman, which she had cashed in the office where she was then employed.

Miss Rose Cohen, a stenographer at one time employed in the same office with respondent, testified as to what transpired when Mrs. Wachter came to respondent's office. Her testimony is as follows: " She came in and she said she was recommended to Mr. Feuerman and she had an accident and I asked her the facts of the case, and I took them down and I made up this statement and I had her sign it." Miss Cohen testified that respondent was not at the office at that time. Respondent testified that he had not known Miss Wachter before she came to his office, and the only information he had as to how she became his client was the statement he received when he came back to his office and was told that a lady called. It may be of interest to note that in the statement prepared by Miss Cohen for Miss Wachter, the following sentence appears: " That your deponent is intimately acquainted with Mr. Feuerman."

It appears that respondent moved to 38 Park Row in 1923. As to his association there with Rubin, the record discloses that respondent was told by his former employer that Rubin had office space to rent; respondent asked Rubin how much he wanted, and also inquired as to stenographic service; respondent hired an office from Rubin and continued there from 1923 until about March,

1927.   One of the witnesses described the suite as having a general office and four private offices; respondent had one of the private offices, Morris Swartzman had one, Augusta Rosenzweig had one, and Rubin the fourth.   There was an entrance into Rubin's office through the suite and also from the hallway.   The testimony is that Rubin's business was investigating; that he had a number of young men to do process serving; that he had many lawyers from whom he would get processes and investigating, and that he did divorce work and things similar or of that nature.

Respondent testified that he never asked Rubin to solicit business for him, and never paid Rubin anything; that with the exception of Duffy, Rubin never introduced to him any client having anything to do with an accident.   Respondent testified that he believed the witnesses against him were lying when they testified they came to him through Rubin, but he could offer no motive therefor, save that Mrs. Jones had two independent claims against the same individual and he only instituted action on one, he having told her that he did not think she had a cause of action on the second one.

It is urged that none of the testimony respecting conversations had with Rubin and other persons was ever connected directly with the respondent.

The testimony of the witnesses is attacked as incredible, but that is a question of fact, and the record does not justify disregarding any of the testimony questioned.

The referee has reported that " The witnesses Bastardi, Duffy, Jones and Wachter were all solicited by the man named Rubin in accident cases that were dormant and which, in all probability, would have remained so but for the solicitation of Rubin.   All these witnesses were under the impression that they were retaining Rubin until they were introduced by him to the respondent who afterwards had charge of their cases, and recognized Rubin as the intermediary who solicited them."

The referee's conclusion as to the charge against respondent under letter (a) of paragraph V of the petition is sustained by the record.

The report of the referee should be confirmed and the respondent be suspended for the period of two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.